UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| SHAYMA ALZUBI, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Case No. 4:26-cv-00838-P |
| | § | |
| FORT WORTH INDEPENDENT SCHOOL | § | |
| DISTRICT, FWISD SUPERINTENDENT | § | |
| DR. PETER LICATA, in his individual and | § | |
| official capacity, and FWISD CHIEF OF | § | |
| STAFF DR. LOUIS KUSHNER, in his | § | |
| individual and official capacity, | § | |
| | § | |
| *Defendants*. | § | |

---

## DEFENDANTS' RESPONSE AND OPPOSITION TO PLAINTIFF'S AMENDED MOTION FOR PRELIMINARY INJUNCTION

---

K. ADAM ROTHEY
arothey@thompsonhorton.com
State Bar No. 24051274

KATHRYN E. LONG
klong@thompsonhorton.com
State Bar No. 24041679

**THOMPSON & HORTON LLP**
500 North Akard Street, Suite 3150
Dallas, Texas 75201
(972) 853-5115 – Telephone
(713) 583-8884 – Facsimile

*Attorneys for Defendants*
*Fort Worth Independent School District,*
*Dr. Peter Licata, and Dr. Louis Kushner*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................... iii

I.    INTRODUCTION ...................................................................................1

II.   FACTUAL BACKGROUND......................................................................2

III.  STANDARD FOR INJUNCTIVE RELIEF ........................................................6

IV.   ARGUMENTS AND AUTHORITIES..............................................................8

      A.    Ms. Alzubi has not clearly established a substantial likelihood
            of success on the merits of her First Amendment retaliation claim.........................9

            1.    Legal framework for entity liability under section 1983. ............................9

            2.    Framework for establishing a First Amendment retaliation claim. ...........10

            3.    Ms. Alzubi has not clearly shown a substantial likelihood of
                  establishing that she has suffered an adverse employment action. ............12

            4.    Ms. Alzubi has not clearly shown a substantial likelihood of
                  establishing that the District reassigned her because of a
                  retaliatory motive based on her speech. ......................................17

            5.    Ms. Alzubi has not clearly shown a substantial likelihood of
                  establishing that any constitutional violation was the direct
                  result of a policy or custom of Fort Worth ISD's Board as is
                  required to succeed on her First Amendment retaliation
                  claim under *Monell*. ...................................................18

      B.    Ms. Alzubi has not clearly shown a substantial threat of irreparable
            harm. ..........................................................................22

      C.    Ms. Alzubi has not clearly established that granting the injunction
            would serve the public interest. .............................................23

V.    CONCLUSION.................................................................................25

CERTIFICATE OF SERVICE ......................................................................26

## TABLE OF AUTHORITIES

**Cases**

*Aryain v. Wal-Mart Stores Tex., LP*,
534 F.3d 473 (5th Cir. 2008) ........................................................................................12

*Baker v. Llano Cnty.*,
746 F. Supp. 3d 429 (W.D. Tex. 2024) ..........................................................................22

*Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*,
520 U.S. 397 (1997) ................................................................................................10, 21

*Becerra v. Asher*,
105 F.3d 1042 (5th Cir. 1997) ........................................................................................9

*Beckerman v. City of Tupelo, Miss.*,
664 F.2d 502 (5th Cir. 1981) ........................................................................................24

*Bennett v. City of Slidell*,
728 F.2d 762 (5th Cir. 1984) ..................................................................................10, 20

*Canal Auth. of State of Fl. v. Callaway*,
489 F.2d 567 (5th Cir. 1974) ..........................................................................................7

*Castro Romero v. Becken*,
256 F.3d 349 (5th Cir. 2001) ........................................................................................22

*Caudillo ex rel. Caudillo v. Lubbock Indep. Sch. Dist.*,
311 F. Supp. 2d 550 (N.D. Tex. 2004) ..........................................................................18

*Cavazos v. Edgewood Indep. Sch. Dist.*,
400 F. Supp. 2d 948 (W.D. Tex. 2005) ..........................................................................16

*City of St. Louis v. Praprotnik*,
485 U.S. 112 (1988) ................................................................................................10, 20

*Clarke v. Commodity Futures Trading Comm'n*,
74 F.4th 627 (5th Cir. 2023) ........................................................................................23

*Conlay v. Baylor College of Med.*,
No. H-08-1038, 2010 WL 774162 (S.D. Tex. March 3, 2010) ......................................22

*Dorsett v. Bd. of Trs. for State Colls. & Univs.*,
940 F.2d 121 (5th Cir. 1991) ..................................................................................12, 18

*Elrod v. Burns*,
427 U.S. 347 (1976) ......................................................................................................23

*Exhibitors Poster Exchange, Inc. v. Nat'l Screen Serv.*,
    441 F.2d 560 (5th Cir. 1971) ..................................................................................7

*Finch v. Fort Bend Indep. Sch. Dist.*,
    333 F.3d 555 (5th Cir. 2003) ...........................................................................15, 16

*Gerhart v. Hayes*,
    217 F.3d 320 (5th Cir. 2000) ................................................................................12

*Groden v. City of Dall.*,
    826 F.3d 280 (5th Cir. 2016) ................................................................................10

*Harrington v. Harris*,
    118 F.3d 359 (5th Cir. 1997) ................................................................................11

*Harris v. Miss. Transp. Comm'n*,
    329 F. App'x 550 (5th Cir. 2009) .........................................................................12

*Harris v. Victoria Indep. Sch. Dist.*,
    168 F.3d 216 (5th Cir. 1999) ...................................................................11, 14, 15

*Jenkins v. Crosby Indep. Sch. Dist.*,
    537 S.W.3d 142 (Tex. App.—Austin 2017, no pet.) ........................................13, 19

*Jett v. Dall. Indep. Sch. Dist.*,
    798 F.2d 748 (5th Cir. 1986) ..............................................................................9, 19

*Justin Indus., Inc. v. Choctaw Sec., L.P.*,
    747 F. Supp. 1218 (N.D. Tex. 1990), *aff'd and remanded*, 920 F.2d 262 (5th
    Cir. 1990) .................................................................................................................7

*Keenan v. Tejada*,
    290 F.3d 252 (5th Cir. 2002) ................................................................................14

*Kennedy v. Bremerton School District*,
    597 U.S. 507 (2022)................................................................................................24

*Kinney v. Weaver*,
    367 F.3d 337 (5th Cir. 2014) ...........................................................................24, 25

*Landmark Am. Ins. Co. v. Millenium Realty Investors, LLC*,
    No. 20-cv-01361-O, 2020 WL 9175055 (N.D. Tex. Dec. 30, 2020)....................7, 8

*Leffall v. Dall. Indep. Sch. Dist.*,
    28 F.3d 521 (5th Cir. 1994) .....................................................................................9

*LeMaire v. La. Dep't of Transp. & Dev.*,
    480 F.3d 383 (5th Cir. 2007) ................................................................................12

iv

*Littell v. Hous. Indep. Sch. Dist.*,
  894 F.3d 616 ..................................................................................................................10

*Lowery v. Mills*,
  157 F.4th 729 (5th Cir. 2025) ........................................................................................11

*Mason v. City of Waco*,
  No. 23-50108, 2024 WL 775508 (5th Cir. Feb. 26, 2024) (per curiam) .................................11

*McMillan v. Monroe Cnty., Ala.*,
  520 U.S. 781 (1997)........................................................................................................22

*Monell v. N. Y. City Dep't of Social Servs.*,
  436 U.S. 658 (1978)................................................................................................ *passim*

*Moore v. Huse*,
  578 F. App'x 334 (5th Cir. 2014) ....................................................................................12

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
  429 U.S. 274 (1977)........................................................................................................12

*Nixon v. City of Hous.*,
  511 F.3d 494 (5th Cir. 2007) ..........................................................................................11

*Okon v. Harris Cnty. Hosp. Dist.*,
  426 F. App'x 312 (5th Cir. 2011) ....................................................................................20

*Paulsson Geophysical Svcs., Inc. v. Sigmar*,
  529 F.3d 303 (5th Cir. 2008) ............................................................................................7

*Pembaur v. City of Cincinnati*,
  475 U.S. 469 (1986)......................................................................................................9, 10

*Peterson v. City of Fort Worth*,
  588 F.3d 838 (5th Cir. 2009) ........................................................................................9, 10

*Pickering v. Bd. of Ed. Of Tp. High Sch. Dist. 205, Will Cnty.*,
  391 U.S. 563 (1968)........................................................................................................25

*Piotrowski v. City of Hous.*,
  237 F.3d 567 (5th Cir. 2001) ........................................................................................9, 10

*Rivera v. Hous. Indep. Sch. Dist.*,
  349 F.3d 244 (5th Cir. 2003) ........................................................................................9, 10

*Ross v. Tex. Educ. Agency*,
  409 F. App'x 765 (5th Cir. 2011) ....................................................................................22

*Rush v. Nat'l Bd. of Medical Examiners*,
    268 F. Supp. 2d 673 (N.D. Tex. 2003) ......................................................................7

*Serna v. City of San Antonio*,
    244 F.3d 479 (5th Cir. 2001) ..........................................................................15, 16

*Sharp v. City of Houston*,
    164 F.3d 923 (5th Cir. 1999) ....................................................................................16

*State of Tex. v. Seatrain Int'l, S.A.*,
    518 F.2d 175 (5th Cir. 1975) ......................................................................................7

*Swanson v. Gen. Servs. Admin.*,
    110 F.3d 1180 (5th Cir. 1997) ..................................................................................12

*White v. Carlucci*,
    862 F.2d 1209 (5th Cir. 1989) ..............................................................................6, 7

*White v. Texas*,
    No. 4:23-CV-925-P, 2023 WL 8518211 (N.D. Tex. Oct. 25, 2023) ........................1

## Statutes

42 U.S.C. § 1983 ................................................................................8, 9, 10, 21, 22

TEX. EDUC. CODE § 11.051 ........................................................................................10

TEX. EDUC. CODE § 11.201 ..............................................................................3, 13, 19

TEX. EDUC. CODE § 39A.003(c) ................................................................................22

TEX. EDUC. CODE § 39A.202 ..............................................................................21, 22

## Other Authorities

U.S. CONST. amend I .......................................................................................... *passim*

U.S. CONST. amend XI ................................................................................................22

TO THE HONORABLE JUDGE OF THE COURT:

Subject to and without waiving their right to move to dismiss Plaintiff's Shayma Alzubi's Amended Complaint ("Complaint"), Defendants Fort Worth Independent School District (the "District" or "Fort Worth ISD"), Superintendent Dr. Peter Licata, and Chief of Staff Dr. Louis Kushner, submit this Opposition and Response to Plaintiff Shayma Alzubi's Amended Motion for Preliminary Injunction ("Motion"). In support, Defendants would show the Court as follows:

## I.    INTRODUCTION

On July 6, 2026, the District informed Ms. Alzubi that she was being reassigned to a higher paying, District-level leadership position, with significant responsibilities for District-wide training and development of principals and assistant principals and advanced curriculum implementation. The District has also now notified Ms. Alzubi that its investigation of her social media activity did not substantiate that she violated District policies or State law. As evidenced by the higher pay, increased advancement opportunities, District-wide exposure, and leadership development responsibilities of Ms. Alzubi's new, District-level position, and the District's public statements in support of Ms. Alzubi, it is clear Ms. Alzubi remains a valued and integral leader in Fort Worth ISD and that the District is not taking any adverse action against her because of or in an effort to chill her speech.

Ms. Alzubi's Motion to force the District to place her into a principal position should be denied for numerous reasons.[1] First, a mandatory injunction like the one requested is subjected to a higher bar than a typical injunction seeking to preserve the status quo. In that context, Ms. Alzubi

---

[1]    Although sued both in their official and individual capacities, the injunctive relief sought against Dr. Licata and Dr. Kushner may only be obtained against them in their official capacities. *See White v. Texas*, No. 4:23-CV-925-P, 2023 WL 8518211, at *4 (N.D. Tex. Oct. 25, 2023) (collecting cases for the proposition that section 1983 does not permit injunctive relief against government officials sued in their individual capacities), *adopted* 2023 WL 8074126 (N.D. Tex. Nov. 21, 2023), *aff'd* 2024 WL 1826245 (5th Cir. Apr. 26, 2024). Moreover, claims against them in their official capacities are subject to dismissal as duplicative of claims against the District. *See infra* Section IV.A.5.

has not clearly shown a substantial likelihood of success on the merits of her First Amendment retaliation claim because she has not clearly shown she suffered an adverse employment action taken in retaliation for her speech. Moreover, even if Ms. Alzubi had clearly shown a substantial likelihood of proving that she had suffered a violation of her First Amendment rights, she has not pled and has no evidence that Fort Worth ISD's Board of Managers (the "Board") has a custom or policy that caused any alleged retaliation in order to impute liability to, and thereby enjoin Defendants under *Monell*. Moreover, her request for mandatory injunction should further be denied because she has not clearly shown that she will suffer irreparable harm or that the requested mandatory injunction will serve the public interest.

## II.    FACTUAL BACKGROUND[2]

Fort Worth ISD has employed Shayma Alzubi since 2013. Dkt. 20, ¶ 19. She is a valued employee. Dkt. 23-11; App. 0009 ¶ 21. Most recently, she worked for four years as an assistant principal at one of the District's high schools. Dkt. 23-1 ¶ 2. Ms. Alzubi remains employed by the District under a one-year term contract. App. 0004 ¶ 10; App. 0116–17.

Ms. Alzubi has never signed a contract with Fort Worth ISD specifically assigning her to be a principal. App. 0005 ¶ 10. Rather, Ms. Alzubi's contracts for the 2025-2026 and 2026-2027 school years ensure her employment with the District as a "Certified Administrator." *Id.* Assistant principal, principal, and numerous District-level leadership roles that call for administrator or principal certifications from the Texas State Board for Educator Certification, all fall within the definition of "Certified Administrator." *Id.* Under the terms of her contract and the Texas Education Code, Ms. Alzubi understands and agrees that the District "has the right to assign or

---

[2]    The Factual Background is drawn from uncontested allegations in Ms. Alzubi's Complaint and the evidence attached to her Motion and this Response. Defendants' evidence offered in support of this Response is contained in a separately filed and consecutively numbered Appendix ("App.").

reassign [her], transfer [her], and to make changes in [her] responsibilities and duties at any time during this Contract." App. 0005 ¶ 11; App. 0116; TEX. EDUC. CODE § 11.201(d)(2). That statutory right to reassign, however, is constrained by District policies (and state and federal laws) acknowledging the First Amendment rights of employees and prohibiting discrimination and retaliation on any "basis prohibited by law." App. 0207, 218.

On May 22, 2026, the District announced a number of new principals for the upcoming school year, including Ms. Alzubi as the new principal of Western Hills High School ("WHHS"). App. 0002 ¶ 4. Public response to Ms. Alzubi's announcement erupted with "hysteria" and "violent objections" (Dkt. 23, p. 5), and raised questions about whether some of Ms. Alzubi's social media activity aligned with District policy and staff expectations. *Id.* The violent and threatening messages also raised concerns about Ms. Alzubi's safety and the safety of the staff at WHHS[3] and the campus where Ms. Alzubi was still working at the time.[4] App. 0003 ¶ 6. As a result, the District announced a temporary reassignment of Ms. Alzubi away from her role as an assistant principal, for the purpose of calming the safety concerns at WHHS and Ms. Alzubi's campus and to allow the District to impartially investigate the questions about Ms. Alzubi's social media activity. App. 0003 ¶ 6. The temporary reassignment to the District's central office ("District Service Center" or "DSC")—as opposed to a placement on administrative leave which often occurs when employee misconduct is alleged—did not result in any loss of pay or benefits to Ms. Alzubi, and also allowed her to continue to perform some of her year-end assistant principal duties. App. 0003 ¶¶ 6–7.

As part of the District's investigation, the District's Office of Professional Standards ("OPS"), the department responsible for investigations into employee conduct, evaluated various

---

[3]     Fortunately, no students were present on campuses at this time because the school year ended May 21, 2026.

[4]     Dr. Louis Kushner, one of the District leaders most involved in Ms. Alzubi's situation, was an assistant principal for Broward County Public Schools at the time of the 2018 Marjory Stoneman Douglas High School shooting. As a result, campus safety is always at the forefront of his thoughts. App. 0003 ¶ 6.

social media postings by Ms. Alzubi (*see* Dkts. 23-5 through 23-10) while also gathering information regarding the reaction to Ms. Alzubi's announcement as principal in the form of media reports, public comments, and communications both in favor of and against Ms. Alzubi's announcement as a principal. App. 0230 ¶¶ 4–5. On June 17, 2026, as part of its investigation, the District interviewed Ms. Alzubi. Dkt. 23-1 ¶¶ 31–32; App. 0230–31 ¶ 6. Ms. Alzubi provided information concerning her social media posts and also corroborated the District's safety concerns. App. 0230–31 ¶ 6. Indeed, Ms. Alzubi herself voiced concerns with OPS and with Dr. Kushner about her safety, informing them about additional personal security measures she had implemented to ensure her personal safety at home, even going so far as to temporarily leave the area and report threats to law enforcement. App. 0003 ¶ 6; App. 0230–31 ¶ 6.

OPS ultimately did not substantiate that Ms. Alzubi's social media activity violated District policy or state law. App. 0231 ¶ 7; App. 0234; App. 0004 ¶ 8. OPS's investigation further corroborated threats of physical violence against Ms. Alzubi, staff at WHHS, and other District officials. App. 0230–31 ¶ 6; App. 0004 ¶ 8. In particular, OPS discovered that even though Ms. Alzubi was not yet working at WHHS, someone had already sent a postcard to WHHS addressed to Ms. Alzubi threatening or intimating sexual violence against her and others. App. 0231–32 ¶ 6. OPS also discovered that a staff member at WHHS had received a phone call threatening her with physical violence in relation to Ms. Alzubi's announcement as principal, which was then reported to the District's Safety and Security Department. *Id.* OPS communicated its findings to District leadership. App. 0004 ¶¶ 8–9. The reality of threats against District employees including employees working at WHHS and the resulting safety concerns—not the substance of Ms. Alzubi's speech—forced District leadership to reconsider whether it was in the best interests of the District to have Ms. Alzubi serve as the principal of WHHS. *Id.*

On July 6, 2026, the District communicated with Ms. Alzubi via telephone and email to inform her of her reassignment to a District-level leadership position titled Principal Program Administrator for the 2026-2027 school year. App. 0007–08 ¶ 16. This was not the same position to which she had been temporarily reassigned during OPS's investigation. The District's communication informed Ms. Alzubi that her new position of Principal Program Administrator, a reassignment consistent with her contract and District policy, would include a salary of $130,000 annually for 239 days of work. App. 0007–08 ¶ 16; App. 0116; App. 0123–25. The District informed Ms. Alzubi that she would report to the DSC effective July 13, 2026. App. 0123–25. Ms. Alzubi's nearly $10,000 increased salary over the WHHS principal position will be applied retroactively to June 1, 2026. App. 0007–08 ¶ 16.

As Principal Program Administrator, Ms. Alzubi is involved in training and developing current and future administrators (assistant principals *and principals*) throughout the District. App. 0006 ¶ 13; App. 0118–22. Ms. Alzubi reports directly to Dr. Valencia Rhines, the District's Senior Executive Director of Leadership, whereas she would only report to an Executive Director as the principal of WHHS. App. 0008 ¶ 16. The Principal Program Administrator position is listed in the 2025-2026 Compensation Manual. App. 0160. The Principal Program Administrator's responsibilities for training principals and assistant principals are similar to some of the responsibilities of an Executive Director, which is a District-level position that also has direct responsibility for supervising and training principals. App. 0007 ¶ 15. Ms. Alzubi's promotion to the Principal Program Administrator role will not detrimentally impact her ability for future promotion, since principals often seek promotion to Executive Director roles, which bear some similar responsibilities as the Principal Program Administrator role. *Id.* The Principal Program Administrator position in fact raises Ms. Alzubi's profile throughout the District by giving Ms.

Alzubi unique access to and responsibility for training campus leaders across the District and will help her form District-wide relationships that may further help advance her career. *Id.*

The District's decision to promote Ms. Alzubi to a higher paying, vacation earning, District-level position was not in retaliation for her speech, but rather in the District's interest in promoting the safe and efficient operation of WHHS, while also recognizing and attempting to promote Ms. Alzubi's continued growth. App. 0004–06, 08–10 ¶¶ 12, 17, 21. The Principal Program Administrator position is a real job with real responsibilities that align well with Ms. Alzubi's experience and expertise. App. 0008–09 ¶ 18. Ms. Alzubi has in fact begun performing in this role during the past week's Principal Leadership Academy meetings involving more than 300 principals and assistant principals, the Superintendent, Chief of Schools, Regional Chiefs, Senior Executive Directors, and Executive Directors. App. 0010 ¶ 22. As a principal, Ms. Alzubi would be one of hundreds of campus administrators on the receiving end of that training. As Principal Program Administrator, she was instead highly visible and actively involved in supporting that training, working alongside Executive Directors to support the training of hundreds of campus leaders. *Id.* Ms. Alzubi is in no way viewed as a troublemaker. App. 0009 ¶ 21. The District has promoted Ms. Alzubi to the Principal Program Administrator position because the District supports her continued advancement in the District. *Id.* Board policies prohibit discrimination and retaliation against employees on all bases prohibited by law. *Id.* ¶ 20.

### III.    STANDARD FOR INJUNCTIVE RELIEF

A preliminary injunction "is an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion." *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989). To obtain a preliminary injunction, a movant must satisfy the heavy burden of demonstrating that (i) there is a substantial likelihood of success

on the merits; (ii) a substantial threat of irreparable injury will result if the injunction is not granted; (iii) the threatened injury outweighs the threatened harm to the nonmovant; and (iv) granting the injunction will not disserve the public interest. *Paulsson Geophysical Svcs., Inc. v. Sigmar*, 529 F.3d 303, 309 (5th Cir. 2008). The decision to grant a preliminary injunction is the exception rather than the rule. *State of Tex. v. Seatrain Int'l, S.A.*, 518 F.2d 175, 179 (5th Cir. 1975).

In this case, an even heavier burden applies because Ms. Alzubi seeks a mandatory injunction to compel the District to place her in the principal position at WHHS as opposed to maintaining the status quo.[5] *See White*, 862 F.2d at 1211; *Landmark Am. Ins. Co. v. Millenium Realty Investors, LLC*, No. 20-cv-01361-O, 2020 WL 9175055, at *1 (N.D. Tex. Dec. 30, 2020); *Justin Indus., Inc. v. Choctaw Sec., L.P.*, 747 F. Supp. 1218, 1220 (N.D. Tex. 1990), *aff'd and remanded*, 920 F.2d 262 (5th Cir. 1990). Mandatory injunctions are "even less favored than prohibitory injunctions" because they compel the nonmovant to perform an act, rather than simply maintain the status quo. *Justin Indus., Inc.*, 747 F. Supp. at 1220 n.5; *Rush v. Nat'l Bd. of Medical Examiners*, 268 F. Supp. 2d 673, 678 (N.D. Tex. 2003).

To obtain a mandatory injunction, plaintiffs carry "the burden of showing *clear entitlement* to the relief under the facts and the law." *Justin Indus., Inc.*, 747 F. Supp. at 1220 (emphasis in original); *see also Exhibitors Poster Exchange, Inc. v. Nat'l Screen Serv.*, 441 F.2d 560, 561 (5th Cir. 1971) (a mandatory injunction "should not be granted except in rare instances in which the facts and law are clearly in favor of the moving party"). And where dispositive facts are undisputed (as is the case here), no oral hearing is required. *See Landmark Am. Ins. Co.*, 2020 WL 9175055,

---

[5]    Alzubi has previously cited *Canal Authority of State of Florida v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974), for the proposition that when the current status quo is causing irreparable injury, a court may return the parties to the last uncontested status quo *by prohibitory injunction*. Dkt. 21, p. 9. *Callaway* in fact says the opposite: "If the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury, either by returning to the last uncontested status quo … by the issuance of ***a mandatory injunction*** … or by allowing the parties to take proposed action that the court finds will minimize the irreparable injury." *Callaway*, 489 F.2d at 576 (emphasis added). Thus, it is clear that what Alzubi seeks is a mandatory injunction.

at *1. As set forth below, Ms. Alzubi cannot demonstrate her entitlement to a mandatory preliminary injunction.

## IV.    ARGUMENT AND AUTHORITIES

Ms. Alzubi moves for a mandatory preliminary injunction only on the basis of her First Amendment retaliation claim under 42 U.S.C. § 1983. Dkt. 23, p. 10. Ms. Alzubi is not entitled to injunctive relief because she has not established and cannot clearly establish that (i) she has a substantial likelihood of success on the merits; (ii) she faces a substantial threat of irreparable harm; (iii) that any threatened injury outweighs the threatened harm to the District; or (iv) that granting injunctive relief will serve the public interest.

Specifically, Ms. Alzubi has not clearly shown a substantial likelihood of proving that she suffered an adverse employment action and that the action was taken because of her speech, or that any official policy or custom of Fort Worth ISD was the moving force purported violation of her First Amendment rights, which is a fundamental requirement in pursuing a section 1983 claim against a governmental entity under *Monell*. And Ms. Alzubi cannot do an end-run around *Monell* by attempting to obtain an injunction against Dr. Licata and Dr. Kushner in their official capacities for the same claim she asserts against the District since official capacity claims are merely another way of suing the governmental entity and would be dismissed as duplicative under Fifth Circuit precedent. Ms. Alzubi's request for mandatory injunction should also be denied because she has not clearly established that she faces a substantial threat of irreparable harm or that granting the injunctive relief will serve the public interest.

**A.      Ms. Alzubi has not clearly established a substantial likelihood of success on the merits of her First Amendment retaliation claim.**

**1.      Legal framework for entity liability under section 1983.**

To state a claim under 42 U.S.C. § 1983, a plaintiff must (1) allege a violation of a right secured by the Constitution or laws of the United States, and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law. *Leffall v. Dall. Indep. Sch. Dist.*, 28 F.3d 521, 525 (5th Cir. 1994). The existence of a constitutional violation is a "threshold" issue. *Peterson v. City of Fort Worth,* 588 F.3d 838, 844 (5th Cir. 2009); *Becerra v. Asher*, 105 F.3d 1042, 1047 (5th Cir. 1997).

The standard for suing a school district under section 1983 is rigorous. A school district may be held liable only for acts for which it is actually responsible; vicarious liability and *respondeat superior* liability are prohibited. *See Peterson*, 588 F.3d at 847; *Rivera v. Hous. Indep. Sch. Dist.*, 349 F.3d 244, 247 (5th Cir. 2003); *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986); *Piotrowski v. City of Hous.*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell v. N. Y. City Dep't of Social Servs.*, 436 U.S. 658, 691 (1978)). Under *Monell*, a plaintiff must show that the constitutional violation was the direct result of the execution of an "official" policy or custom, the custom or policy was approved or sanctioned by the entity's final "policymaker," and the official policy or custom was the moving force behind the violation of a constitutional right. *See Piotrowski*, 237 F.3d at 578–79.[6]

"A policy or custom is official only when it results from the decision or acquiescence of the … body with final policymaking authority over the subject matter of the offending policy."

---

[6]      An official policy or custom is "[a] policy statement, ordinance, regulation, or decision that is officially adopted and promulgated" by the final policymaker or a "persistent, widespread practice" of the entity that is "so common and well settled as to constitute a custom that fairly represents [its] policy." *Jett v. Dall. Indep. Sch. Dist.*, 798 F.2d 748, 759 (5th Cir. 1986) (citation omitted).

*Peterson*, 588 F.3d at 847 (internal quotation marks omitted). The identification of the "final policymaker" is a question of state law. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 124 (1988). Under Texas law, the final policy-making authority for a school district is the district's board of trustees, acting as a body corporate. *See* Tex. Educ. Code §§ 11.051(a), 11.051(a-1), 11.151(b); *see also Rivera*, 349 F.3d at 247. While she need not plead the specific identity of the policymaker, *see Groden v. City of Dall.*, 826 F.3d 280, 284 (5th Cir. 2016), a section 1983 plaintiff must show that the policymaker adopted an unconstitutional policy or that it otherwise knew about or acquiesced in a persistent and widespread, or "deeply embedded," unconstitutional practice. *See Piotrowski*, 237 F.3d at 578–79. And in the case of a facially innocuous or facially constitutional policy, a plaintiff must show deliberate indifference by the policymaker to known constitutional risks. *See Littell v. Hous. Indep. Sch. Dist.*, 894 F.3d 616. 624 (5th Cir. 2018).

The alleged unconstitutional conduct must be "directly attributable" to the final policymaker, not based on the isolated acts of individual employees. *Rivera*, 349 F.3d at 247; *Bennett v. City of Slidell*, 728 F.2d 762, 768 (5th Cir. 1984). A plaintiff must establish that the entity through its deliberate conduct "was the moving force behind the injury" alleged and must establish a direct causal link between the governmental entity's official policies and the deprivation of a constitutional right. *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 405 (1997). This requirement ensures that liability under section 1983 is limited to "action for which the [entity] is actually responsible . . . that is, acts which the [entity] has officially sanctioned or ordered." *Pembaur*, 475 U.S. at 479–80.

### 2.    Framework for establishing a First Amendment retaliation claim.

To state a First Amendment retaliation claim, a plaintiff must show that: "(1) [she] suffered an adverse employment action; (2) [she] spoke as a [private] citizen on a matter of public concern; (3) [her] interest in the speech outweighs the government's interest in the efficient provision of

10

public services; and (4) the speech precipitated the adverse employment action." *Nixon v. City of Hous.*, 511 F.3d 494, 497 (5th Cir. 2007) (citations and quotes omitted). Only the first and fourth elements are in dispute for the purposes of the Motion.

On the question of whether a public employee has suffered an adverse employment action under the First Amendment retaliation framework, the Fifth Circuit has recently reaffirmed the "narrow view" that "[a]dverse employment actions are discharges, demotions, refusals to hire, refusals to promote, and reprimands." *Lowery v. Mills*, 157 F.4th 729, 743 (5th Cir. 2025). Transfers or reassignments may also constitute adverse actions when they are the equivalent of a demotion. *Harris v. Victoria Indep. Sch. Dist.*, 168 F.3d 216, 221 (5th Cir. 1999) But "mere accusations or criticism," "investigations," and "false accusations" are not adverse employment actions. *Lowery*, 157 F.4th at 743 (professor did not experience adverse employment action where not fired or demoted and contract renewed and pay increased); *see also Mason v. City of Waco*, No. 23-50108, 2024 WL 775508, at *3 (5th Cir. Feb. 26, 2024) (per curiam). And changes in assignments or other similar administrative decisions do not constitute adverse employment actions in the First Amendment context. *Harrington v. Harris*, 118 F.3d 359, 365 (5th Cir. 1997) ("Actions such as 'decisions concerning teaching assignments, pay increases, administrative matters, and departmental procedures,' while extremely important to the person who has dedicated his or her life to teaching, do not rise to the level of a constitutional deprivation."). Moreover, in the First Amendment context, the Fifth Circuit has recognized that federal courts should be extremely hesitant "to invade and take over" in the area of education: a federal court is not the appropriate forum in which to seek redress over "disputes … [concerning] teaching assignments, room assignments, administrative duties, classroom equipment, teacher recognition, and a host of

11

other relatively trivial matters." *Dorsett v. Bd. of Trs. for State Colls. & Univs.*, 940 F.2d 121, 123–24 (5th Cir. 1991).

And on the question of causation, Ms. Alzubi must show that any adverse employment action was substantially motivated by the protected speech. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977). "[U]nder the … *Mt. Healthy* doctrine, [the plaintiff's] protected speech must be the 'but for' cause of the adverse employment" action in order to support a First Amendment retaliation claim. *Moore v. Huse*, 578 F. App'x 334, 339 (5th Cir. 2014) (citing *Hartman v. Moore*, 547 U.S. 250, 260 (2006)). Mere awareness of the alleged protected activity without evidence of a retaliatory motive is insufficient to establish a causal relationship. *See, e.g., Gerhart v. Hayes*, 217 F.3d 320, 322 (5th Cir. 2000). And while "[c]lose timing between an employee's protected activity and an adverse action . . . may provide the 'causal connection' required to make out a prima facie case of retaliation," *Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997), temporal proximity is insufficient to establish an issue of fact that the employer's stated non-retaliatory reason for the adverse action is pretextual. *Aryain v. Wal-Mart Stores Tex., LP*, 534 F.3d 473, 487 (5th Cir. 2008). At the pretext level of the *Mt. Healthy* framework, a plaintiff's mere dispute of the facts underlying her termination is insufficient to raise a fact issue that the employer's stated reason for the termination is false. *See, e.g., Harris v. Miss. Transp. Comm'n*, 329 F. App'x 550, 557 (5th Cir. 2009); *Aryain*, 534 F.3d at 487. And a reviewing court is not to engage in judicial second-guessing of an employer's business decisions. *See LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 391 (5th Cir. 2007).

### 3.   Ms. Alzubi has not clearly shown a substantial likelihood of establishing that she has suffered an adverse employment action.

Ms. Alzubi has not clearly shown a substantial likelihood of demonstrating that she has suffered an adverse employment action. Ms. Alzubi does not dispute that her employment contract

12

with the District is not specifically for a principal position. App. 0004–05 ¶ 10. She does not dispute that both her 2025-2026 and 2026-2027 contracts call for her assignment to fall within the role of a "Certified Administrator." *Id.*; App. 0114–17. Ms. Alzubi also does not dispute that her Principal Program Administrator position falls within the definition of a "Certified Administrator." Ms. Alzubi also cannot dispute that under Texas Education Code § 11.201(d)(2) and paragraph 4.3 of her contracts, "the District has the right to assign or reassign [her], transfer [her], and to make changes in [her] responsibilities and duties at any time" during the period of the contract. App. 0005 ¶ 11; *see also Jenkins v. Crosby Indep. Sch. Dist.*, 537 S.W.3d 142, 157 (Tex. App.—Austin 2017, no pet.) ("Under the express language of the contract, as well as section 11.201(d)(2) of the Texas Education Code, the superintendent had the express authority to reassign [plaintiff] … .").

Ms. Alzubi also does not dispute that the Principal Program Administrator position carries a higher annual salary of $130,000.00 and is a District-level, as opposed to a campus-level administrator position. App. 0007–08 ¶ 16; App. 0123–24. Moreover, it is undisputed that the Principal Program Administrator position: requires prior campus administrator experience showing it is a step up from a campus administrator position; reports to a Senior Executive Director as opposed to an Executive Director; has responsibilities for developing and implementing District-wide training and development for assistant principals and *principals* alike; and actually improves or increases Ms. Alzubi's potential for growth or advancement in the District. *See* App. 0006–07 ¶¶ 13–15. Indeed, principals also often seek promotion to Executive Director roles who also have responsibilities for supervising and training principals, similar to the training and development responsibilities that Ms. Alzubi will fulfill as Principal Program Administrator. App. 0007 ¶ 15. Moreover, the Principal Program Administrator position has already exposed Ms. Alzubi to District and school leaders around the District and will help her facilitate relationships

13

with District leaders that are also likely to help advance her career. *Id.* As a result, Ms. Alzubi's reassignment to the Principal Program Administrator role will actually improve her ability to seek promotion to an Executive Director role or other position above that of an Executive Director. *Id.*

And the Principal Program Administrator position is objectively viewed as more desirable than campus leadership positions because of its more consistent work hours, lack of after-school obligations (such as serving for long hours at night and on the weekend as the Administrator on Duty for school sporting, music, and artistic events), and reduced stress load due to a lack of responsibility for student issues. App. 0006–07 ¶ 14. In light of the foregoing undisputed facts, Ms. Alzubi has not clearly established a substantial likelihood of demonstrating that her reassignment to this position is objectively a demotion as is required to qualify as an adverse employment action under Fifth Circuit case law. App. 0006–07 ¶¶ 13–15.

At best, Ms. Alzubi asserts that she "coveted" the principal role and that she finds its responsibilities of campus administration and oversight to be more interesting than those of the Principal Program Administrator.[7] Dkt. 23-1 ¶ 3. But Ms. Alzubi's personal beliefs do not clearly show a substantial likelihood of proving the reassignment is effectively a demotion. On the contrary, "'a plaintiff's subjective perception that a demotion has occurred is not enough' to constitute an adverse employment decision." *Harris*, 168 F.3d at 221. Rather, the adverse employment action standard is an objective standard, and asks "whether a person of ordinary firmness would be chilled, rather than whether the particular plaintiff is chilled." *Keenan v. Tejada*, 290 F.3d 252, 259–60 (5th Cir. 2002) (internal citations omitted). Under this objective standard and in the face of undisputed facts showing Ms. Alzubi's promotion to a higher-paying, vacation

---

[7]     Ms. Alzubi's description of the duties in her new position as being "bureaucrat[ic]" appears to mistakenly refer to the duties she temporarily fulfilled while temporarily reassigned during the District's investigation, not her duties as Principal Program Administrator. *See* Dkt. 23, pp. 16–17 (citing to paragraph 26 of Ms. Alzubi's Declaration discussing her temporary duties, not those of the Principal Program Administrator).

earning, District-level, higher-profile position with responsibilities for training and developing principals District-wide, she does not clearly show a substantial likelihood of demonstrating that this reassignment would chill a reasonable person from engaging in protected speech.

Ms. Alzubi's caselaw highlights that fact. Ms. Alzubi relies heavily on *Harris*, which found that midyear transfers of two teachers to different teaching positions constituted adverse employment actions in the summary judgment context. 168 F.3d at 221. But in *Harris*, the plaintiffs presented evidence from the Superintendent that the transfers were "intended … to be disciplinary," and from a Board member that the transfers labelled the teachers as "troublemakers" and "not team players." *Id.* Ms. Alzubi presents no such evidence here, which is of greatest importance to the adverse action analysis. *See Serna v. City of San Antonio*, 244 F.3d 479, 485 (5th Cir. 2001) ("Most importantly, Serna has not shown that [the] transfers … were ordered as punishment, either for himself or for anyone else."). On the contrary, the undisputed evidence is that Ms. Alzubi's reassignment to a District-level position is *not* intended to be disciplinary or as a punishment. App. 0005–06, 08 ¶¶ 12, 17. Furthermore, the District—including the Superintendent in his announcement of Ms. Alzubi's reassignment to the Principal Program Administrator role—has publicly affirmed that Ms. Alzubi remains a valued employee by both its words and actions of promoting her to a higher-paying, more prestigious, District-level position. App. 0009–10 ¶ 21; Dkt. 23-11.

Ms. Alzubi also relies on *Finch v. Fort Bend Independent School District*, 333 F.3d 555, 563 (5th Cir. 2003), arguing that the Fifth Circuit found a reassignment of a middle school principal to a "Facilitator Classified Staff Development" position was adverse. Dkt. 23 p. 16. But the Fifth Circuit in *Finch* merely "assume[d]" the reassignment constituted an adverse employment action while in fact affirming dismissal of the plaintiff's First Amendment retaliation claim for failure to

15

satisfy the requirement that the speech was protected. *Finch*, 333 F.3d at 563–64. Indeed, *Finch* contains no specific factual analysis about the different positions at issue that supports Ms. Alzubi's burden of clearly showing that the Principal Program Administrator position is a demotion. And her reliance on *Cavazos v. Edgewood Independent School District*, 400 F. Supp. 2d 948, 957 (W.D. Tex. 2005) is not well founded since there, in the context of determining whether the plaintiff had merely produced some evidence to survive summary judgment, the plaintiff produced unrebutted evidence that the reassignment to a principal position at a smaller school actually reduced her room for advancement, whereas here, the only evidence is that Ms. Alzubi's reassignment in fact increases her opportunities for advancement. App. 0009 ¶ 21.

Ms. Alzubi's reliance on *Sharp v. City of Houston*, 164 F.3d 923 (5th Cir. 1999) is also misplaced because there, the Fifth Circuit was not asked to and did not find that an adverse action had occurred. Rather, it merely found that under the "highly deferential plain error standard of review," there was at least "some evidence" on which the jury could have found that a transfer was a constructive demotion. 164 F.3d at 933–34. But the question for the Court here is not whether there is merely "some evidence" that Ms. Alzubi's reassignment constitutes a demotion; rather, Ms. Alzubi faces the burden of clearly showing a substantial likelihood that she will ultimately be able to prove that the reassignment to the Principal Program Administrator position *is* objectively equivalent to a demotion. Ms. Alzubi has not met that burden. Indeed, Ms. Alzubi does not cite, and Defendants are not aware of a case where a plaintiff has successfully proven that a reassignment to a *higher* paying position without a reprimand objectively constituted an adverse employment action. *See Serna*, 244 F.3d at 485 (noting that the Fifth Circuit had only twice found transfers without a pay-cut or without a reprimand to constitute adverse employment actions: once where "everybody" considered the transfer to be a demotion and the transferees lost seniority rights

16

and second time where a transfer to the night shift was objectively less prestigious and interesting and had worse working hours). For these reasons, Ms. Alzubi cannot clearly establish a substantial likelihood of success on her First Amendment retaliation claim.

> **4.      Ms. Alzubi has not clearly shown a substantial likelihood of establishing that the District reassigned her because of a retaliatory motive based on her speech.**

Ms. Alzubi's request for mandatory injunction should also be denied because she has not clearly shown a substantial likelihood that she will be able to prove the District had a retaliatory motive with respect to the reassignment. Ms. Alzubi concedes that the majority of her social media posts are years-old, and she presents no evidence that these social media posts have had any prior adverse impact on her employment with Fort Worth ISD. Ms. Alzubi herself claims that individuals involved in her hiring to the principal position were aware of at least some of her social media posts and that she was hired nonetheless. Dkt. 23-1 ¶¶ 5, 9. Assuming the truth of Ms. Alzubi's claims, the District hired her to the principal position *despite* her speech. Moreover, the District's investigation of Ms. Alzubi's social media activity did not find that it violated District policies or state law, and the District has now promoted her to an even higher-paying, District-level position. None of these undisputed facts suggest retaliatory motive by the District.

The decision to pivot regarding Ms. Alzubi's promotion was not because the District disagreed with or wanted to silence her speech. App. 0008 ¶ 17. On the contrary, the decision was guided by the District's interests in campus safety and avoiding disruptions to the learning environment that only became evident after the District announced Ms. Alzubi as the principal of WHHS. App. 0004 ¶ 9. Ms. Alzubi outlines what she describes as the hysterical and violent reaction to her announcement as principal (Dkt. 23 p. 1), as well as multiple efforts by District officials to check in on her well-being and safety (Dkt. 23-1 ¶¶ 11–13). The District's investigation revealed further information about specific threats of physical and sexual violence directed at Ms.

17

Alzubi and WHHS staff, which necessitated reports to the District's Safety and Security Department, local law enforcement, and increased personal security measures by Ms. Alzubi, including physically leaving the area. App. 0230–31 ¶ 6; App. 0003–04 ¶¶ 6, 8. In light of these real (not imagined or anticipated) threats, the District determined that it would be better to promote Ms. Alzubi to a central office role where it could better protect her and respond to any ongoing threats without causing disruption to the learning environment of approximately 900 students at WHHS. App. 0005–06, 10 ¶¶ 12, 23. The decision had nothing to do with any alleged retaliatory motive of the District based on her speech. App. 0008 ¶ 17.

Without clear evidence that the District promoted Ms. Alzubi because of any retaliatory motive, this is exactly the type of administrative decision that federal courts should hesitate to "invade and take over," especially in the context of a request for mandatory injunction. *Dorsett*, 940 F.2d at 124; *see Caudillo ex rel. Caudillo v. Lubbock Indep. Sch. Dist.*, 311 F. Supp. 2d 550, 569 (N.D. Tex. 2004) ("'We pause here to express our doubts about the appropriateness of litigation that is intended … to wrest the day-to-day control of our troubled public schools from school administrators'" who "relied on their years of experience in the realm of public education to make a judgment call as to the safety of the students") (internal citations omitted).

> **5.    Ms. Alzubi has not clearly shown a substantial likelihood of establishing that any constitutional violation was the direct result of a policy or custom of Fort Worth ISD's Board as is required to succeed on her First Amendment retaliation claim under *Monell*.**

Ms. Alzubi's Complaint does not reference any policies of the District and contains no allegations that any alleged violation of her First Amendment rights directly resulted from an official policy or custom of the Board. Rather, Ms. Alzubi argues in her Motion that because her Board-signed contract and a Board policy authorize reassignment by the Superintendent, this

satisfies her burden of clearly establishing a substantial likelihood of her ability to succeed in holding the District liable under *Monell*. Ms. Alzubi's argument fails on two levels.

First, the Superintendent's authority to assign and reassign school district employees does not depend on a contract or District policy. The Superintendent's authority to assign and reassign personnel is statutory. *See* TEX. EDUC. CODE § 11.201(d)(2) (superintendent's statutory duties include "assuming administrative authority and responsibility for the assignment, supervision, and evaluation of all personnel of the district"); *Jenkins*, 537 S.W.3d at 157 ("Under the express language of the contract, as well as section 11.201(d)(2) of the Texas Education Code, the superintendent had the express authority to reassign [plaintiff] … ."). Thus, it is the Texas legislature, not the Board, that has authorized superintendents to reassign personnel, and any contractual or policy language to that effect merely *reflects* that statutory right rather than creates it. And while Ms. Alzubi argues this language gives the District authority to reassign personnel for unlawful reasons, she is incorrect, and this argument is belied by undisputed evidence and common sense. Indeed, Ms. Alzubi could hardly argue that merely because the Texas legislature authorized school superintendents to reassign personnel that they intended superintendents to utilize that authority in an unlawful discriminatory or retaliatory manner, especially where other Texas laws prohibit discrimination and retaliation, as do the District's own policies, which also constrain superintendent decisions. *See* App. 0207–28.

Second, even if the Superintendent's reassignment authority depended on a Board-approved contract or District policy (which it does not), Ms. Alzubi's argument also confuses the distinct concepts of "policymaker" and "decision-maker."[8] *See Jett*, 7 F.3d at 1245–46 (5th Cir.

---

[8]     Although the policy referenced by Ms. Alzubi (DK (Local)) appears to be in effect on the District's policy website (https://pol.tasb.org/PolicyOnline/PolicyDetails?key=1101&code=DK#localTabContent), the undersigned just learned that the Board temporarily suspended it and other policies in March. *See* https://fortworthisd.granicus.com/DocumentViewer.php?file=fortworthisd_218acb36ad81906a2d345b8c4ca789f6.p

1994) (holding that although a superintendent may have been delegated final *decision-making* authority regarding employee transfers, his decisions had to comply with *policy*; the superintendent was not a *policymaker*); *Bennett*, 728 F.2d at 769 ("[T]he delegation of policymaking authority requires more than a showing of mere discretion or decisionmaking authority on the part of the delegee."). This distinction means that when an official's decisions are constrained by policies not of that official's making, *those policies*, rather than the departures from them, are the act of the government. *Praprotnik*, 485 U.S. at 130.

Here, Ms. Alzubi does not argue that the Board delegated policymaking authority to the superintendent, and it is undisputed that the District has policies that constrain the superintendent's decisions by prohibiting the type of discrimination or retaliation complained of by Ms. Alzubi. App. 0207–28. Thus, Ms. Alzubi is wrong to suggest that the Superintendent's statutory authority to make reassignment decisions is unconstrained. On the contrary, that authority is constrained by state and federal law as well as the District's official policies prohibiting discrimination and retaliation in employment practices. *Id.* Even assuming arguendo that the decision to reassign Ms. Alzubi was retaliatory, she does not allege, much less provide evidence linking that alleged retaliatory animus to the Board. *See Okon v. Harris Cnty. Hosp. Dist.*, 426 F. App'x 312, 317–19 (5th Cir. 2011) (although board approved reduction in force, plaintiff did not show that the board itself knew of supervisors' alleged racial animus or that it approved any alleged racial animus underlying the decision to terminate her).

Further, Ms. Alzubi pleads no facts and offers no evidence to show that the Board ratified or acted with "deliberate indifference" to any risk of retaliation even if it—and not the Texas legislature—had delegated reassignment authority to the Superintendent. Deliberate indifference

---

df&view=1. The Board did not, however, suspended its antidiscrimination or antiretaliation policies referenced herein (*see* DG (Legal) and DIA (Local), App. 207–28). *See id.*

is a "stringent" standard that requires more than "even heightened negligence." *Brown*, 520 U.S. at 407, 410. The claimant must show that the "plainly obvious consequence" of the policymaker's decision will be "the deprivation of a third party's federally protected right." *Id.* at 411. A "generalized" risk of harm is not enough. *Id.* at 410. Ms. Alzubi has not pleaded any facts or produced any evidence that would allow the Court to clearly conclude that the "plainly obvious consequence" of a school board delegating reassignment authority to its superintendent would be retaliatory reassignments. On the contrary, where the Board has adopted numerous policies prohibiting discrimination and retaliation, it is clear that it would not be plainly obvious to the Board that consequence of some discretion in personnel actions would be discrimination or retaliation.

Here, it is undisputed that the Board's policies—along with state and federal law—prohibit retaliation against employees who engage in protected speech under the First Amendment. App. 0074–75, 207–28. And Ms. Alzubi presents no allegations, evidence, or even argument that there exists an official custom of retaliation that the Board is aware of or has acquiesced to. Moreover, it is also undisputed that the Board, as a body corporate, has not taken any action on and was involved in decision-making regarding Ms. Alzubi's promotion to the Principal Program Administrator position. App. 0009 ¶ 19. Thus, even if Ms. Alzubi could show a substantial likelihood of proving the elements of her First Amendment retaliation claim, she has not clearly shown a substantial likelihood of demonstrating that the District should be liable for that violation under *Monell*.[9] And suing the Superintendent and Chief of Staff for an injunction in their official

---

[9]    Even if Ms. Alzubi could prove the elements of *Monell*, there is a question of whether Fort Worth ISD and its Superintendent enjoy Eleventh Amendment sovereign immunity from Ms. Alzubi's section 1983 claims. The Texas Education Agency ("TEA") has intervened in the operations of Fort Worth ISD and appointed a Board of Managers to replace the locally elected Board of Trustees. *See* https://tea.texas.gov/health-safety-and-discipline/school-boards/school-governance/board-managers. TEA also appointed Dr. Licata as Fort Worth ISD's Superintendent. *Id.* Boards of Managers are leadership teams "appointed by TEA" under state law. *Id.*; *see also* TEX. EDUC. CODE § 39A.202. While a Board of Managers is in place, the "powers of the board of trustees of the district are suspended … ."

capacities does not change the result—which Ms. Alzubi concedes (*see* Dkt. 23 p. 11)—because official capacity suits are the same as a suit against the governmental entity itself. *McMillan v. Monroe Cnty., Ala.*, 520 U.S. 781, 785 n.2 (1997). And where those claims seek identical relief, the official capacity claims are properly dismissed as duplicative. *Castro Romero v. Becken*, 256 F.3d 349, 355 (5th Cir. 2001). This is true even with injunctive relief since such relief is available against the entity. *Baker v. Llano Cnty.*, 746 F. Supp. 3d 429, 439 (W.D. Tex. 2024).

> **B.      Ms. Alzubi has not clearly shown a substantial threat of irreparable harm.**

Ms. Alzubi's request for mandatory injunction should also be denied because she has not clearly shown a substantial threat of irreparable harm. Irreparable harm is "perhaps the single most important prerequisite for the issuance of a preliminary injunction." *Conlay v. Baylor College of Med.*, No. H-08-1038, 2010 WL 774162, at *5 (S.D. Tex. March 3, 2010). Irreparable harm requires a showing that (i) harm to the plaintiff is imminent; (ii) the injury would be irreparable; and (iii) the plaintiff has no other adequate legal remedy." *Id.* (citing *Chacon v. Granata*, 515 F.2d 922, 925 (5th Cir. 1975)). Irreparable harm must be proven separately and convincingly, or no injunction may issue. *Id*. The burden of proof is not reduced by either the existence of an extremely strong likelihood of success on the merits or the egregiousness of the alleged wrong upon which the underlying claim is based. *Id*.

---

TEX. EDUC. CODE § 39A.202. TEA has also appointed a Conservator over Fort Worth ISD. *See* https://tea.texas.gov/health-safety-and-discipline/school-boards/school-governance/letter-from-tea-to-superintendent-and-board-of-trustees-october-23-2025.pdf. The TEA Conservator has the authority to direct an action of the Board of Managers or Superintendent or to approve or disapprove of any action of the Board of Managers or Superintendent under Texas Education Code § 39A.003(c). *See* https://tea.texas.gov/health-safety-and-discipline/school-boards/school-governance/bom-faqs-1.pdf. The Fifth Circuit has affirmed dismissal of constitutional claims brought against TEA under section 1983 on the basis of the State's Eleventh Amendment sovereign immunity. *Ross v. Tex. Educ. Agency*, 409 F. App'x 765, 768–69 (5th Cir. 2011). Fort Worth ISD is not aware of any cases addressing the issue of whether a school district led by a TEA-appointed Board of Managers and overseen by a TEA-appointed Superintendent and Conservator enjoys Eleventh Amendment immunity. Fort Worth ISD nonetheless raises the question so as not to waive any such jurisdictional argument against Alzubi's claims.

Ms. Alzubi's entire argument regarding irreparable harm is her citation to *Elrod v. Burns*, 427 U.S. 347 (1976), for the proposition that the loss of First Amendment freedoms even for a short period of time constitutes irreparable injury. But unlike in *Elrod*, Ms. Alzubi has not been discharged or even threatened with discharge on account of her speech. On the contrary, the District has investigated her speech and found that it did *not* violate District policy. Ms. Alzubi also does not present any evidence that anyone with the District has requested that she stop speaking on the matters at issue in her social media postings. It is also undisputed that Ms. Alzubi remains employed by Fort Worth ISD in a more highly compensated, higher-profile, District-level position. And the District has made public statements in support of Ms. Alzubi and her continued success and professional advancement. *See* Dkt. 23-11. Thus, the undisputed evidence demonstrates that Ms. Alzubi remains free to engage in private speech on matters of public concern through her private social media just like she has previously done.

### C.    Ms. Alzubi has not clearly established that granting the injunction would serve the public interest.

The final two prongs of the preliminary injunction analysis—the balance of the equities and the public interest—"merge when the Government is the opposing party," and favor denying Ms. Alzubi's injunction request. *Clarke v. Commodity Futures Trading Comm'n*, 74 F.4th 627, 643 (5th Cir. 2023). Ms. Alzubi argues only that her speech is old and has never caused a workplace disruption in the past. Dkt. 23 p. 18–19. This argument proves the District's point: it did not act in retaliation against or in an effort to suppress Ms. Alzubi's speech. Rather, it decided to address safety concerns arising out of actual, not hypothetical threats made to Ms. Alzubi and staff at WHHS.[10]

---

[10]    Ms. Alzubi's argument that the reassigned position increases risks to her lacks merit. The DSC has 24-hour security in place while she is working there, she has significant control over whether her meetings are virtual or in

23

This is also where Ms. Alzubi's "heckler's veto" argument fails. The heckler's veto doctrine arises where the government attempts to preemptively restrict or suppress speech, often through ordinances or regulations, based on the anticipation of or actual disruptive reactions from a hostile audience. *See Beckerman v. City of Tupelo, Miss.*, 664 F.2d 502, 510 (5th Cir. 1981) (finding municipal ordinance that prohibited issuance of parade permits if the city determines the permit would "provoke disorderly conduct" is unconstitutional as a prior restraint on free speech). But it is undisputed that Fort Worth ISD has not taken any action to restrict or suppress Ms. Alzubi's speech. Indeed, much of the speech at issue predated her assignment as principal and the District took no action on it based on potential threats it might create; rather, the District merely responded to *actual* threats that arose after Ms. Alzubi was announced as principal.

Indeed, Fort Worth ISD—by finding Ms. Alzubi's speech did *not* violate its policies and by *promoting* Ms. Alzubi to a higher-paying, District-level position—is attempting to support Ms. Alzubi and her First Amendment rights while balancing its interests in promoting safe and efficient educational services at WHHS. Thus, this case could not be further from the situations in *Kennedy v. Bremerton School District*, 597 U.S. 507 (2022), where a school district *fired* a coach who knelt in prayer at midfield after games based on anticipated or hypothetical legal concerns, and in *Kinney v. Weaver*, 367 F.3d 337, 356 (5th Cir. 2014), where police academy instructors were forced to accept *lower* paying jobs as a result of a boycott against them due to their expert testimony against police officers on excessive force claims. Ms. Alzubi, by contrast, has freely expressed her views and religion through her personal social media and has in fact been promoted to a higher paying, higher profile position.

The District has a legitimate interest in promoting the efficiency of the public services it

---

person, and if in person, only a limited number of individuals will know where she will be at any given time. App. 0010 ¶ 23.

24

performs and ensuring its schools are safe and not subject to disruptions to the learning environment that would inevitably occur if a campus principal were having to respond to ongoing threats. *See Pickering v. Bd. of Ed. Of Tp. High Sch. Dist. 205, Will Cnty.*, 391 U.S. 563, 568 (1968). Based on what the District experienced after announcing Ms. Alzubi as principal and learned regarding threats of violence against her and staff at WHHS, the District reasonably determined that it would best mitigate the safety and disruption concerns by promoting Ms. Alzubi to higher paying, District-level position that would continue her upward career trajectory. App. 0005–06, 08, 10 ¶¶ 12, 17, 23. The District should not have to wait and see whether additional threats, disruptions, or safety issues arise at WHHS when students are back on campus before pivoting as it has done, since any later pivot during the school year would only further disrupt the learning environment. *See Kinney*, 367 F.3d at 364 (holding that "we … are mindful of the fact that a prudent administrator will often wish to take action before a risk ripens into an actual workplace disruption," and may do so as long as the "predictions of disruption [are] reasonable"). This is especially true here where, objectively speaking, the District, Dr. Licata, and Dr. Kushner have taken great care to ensure that Ms. Alzubi has not suffered an adverse employment action and retains her First Amendment rights.

## V.    CONCLUSION

Ms. Alzubi has not carried her burden of clearly demonstrating a substantial likelihood of success as to the elements of her First Amendment retaliation claim. Neither has she clearly demonstrated a substantial threat of irreparable injury, or that any threatened injury to her outweighs the public interest. Accordingly, Defendants request that the Court deny her Motion for Preliminary Injunction.

Respectfully submitted,

*/s/ Adam Rothey*
K. ADAM ROTHEY
arothey@thompsonhorton.com
State Bar No. 24051274

KATHRYN E. LONG
klong@thompsonhorton.com
State Bar No. 24041679

**THOMPSON & HORTON LLP**
500 North Akard Street, Suite 3150
Dallas, Texas 75201
(972) 853-5115 – Telephone
(713) 583-8884 – Facsimile

*Attorneys for Defendants*
*Fort Worth Independent School District,*
*Dr. Peter Licata, and Dr. Louis Kushner*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of this document has been served upon all counsel of record via the Court's electronic filing system on July 27, 2026.

Lena Masri
Gadeir Abbas
Hufsa Husain
CAIR Legal Defense Fund
453 New Jersey Avenue SE
Washington, DC 20003
ldf@cair.com

Jason C.N. Smith
Law Offices of Jason Smith
612 Eighth Avenue
Fort Worth, TX 76104
jasons@letsgotocourt.com

*/s/ Adam Rothey*
K. Adam Rothey

26